UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VINGAL CARTER,

                Plaintiff,

– against –

WARDEN A.M.K.C. MAXSOLAINE MINGO,
JOSEPH PONTE, NYC COMM. OF D.O.C., JANE
DOE, MEDICAL STAFF, JOHN DOE, A.M.K.C.
(C-95), and C.O. JOHN DOE (INTAKE STAFF),

                Defendants.

**OPINION AND ORDER**

16 Civ. 7736 (ER)

Ramos, D.J.:

       Vingal Carter, acting *pro se* and *in forma pauperis*, brings this action against Defendants Warden Maxsolaine Mingo, Commissioner Joseph Ponte, and three as-yet unidentified Doe defendants, (collectively "Defendants"), pursuant to 42 U.S.C. § 1983. Carter alleges that his constitutional rights were violated while held in the custody of the New York City Department of Correction at the Anna M. Kross Center ("AMKC") on Rikers Island, between April 2016 and October 2016. Am. Compl., Doc. 11. Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Defendants' motion for summary judgment is GRANTED.

**I.    BACKGROUND**[1]

Liberally construed, Carter brings an unconstitutional conditions of confinement claim. Carter alleges that, following his arrival at AMKC on April 17, 2016, he was held in the intake holding pen for a total of 180 days, a period which he claims was excessive. Am. Compl. ¶ 1. During that period of time, he asserts that he was not provided with the basic standards of service that pre-trial detainees typically receive. *Id.*; Defs.' 56.1 ¶ 3. Specifically, Carter alleges that he was denied "meaningful medical care," basic hygiene products, access to showers, visitation rights, and access to the facility's recreational, commissary, and library facilities. Am. Compl. ¶ 2; Defs.' 56.1 ¶ 3. He further alleges that he was forced to sleep on a bed frame that was too small for his six-foot-three-inch, 245 pound frame, requiring him to sleep on the floor on a mattress that did not provide sufficient support. Am. Compl. ¶ 5; Defs.' 56.1 ¶ 3. With respect to medical care, Carter contends that he was "consistently called . . . to the medical clinic" after—rather than before—dinner to receive his diabetes treatment, despite his request to receive his medication before his meal. Am. Compl. ¶ 7; Defs.' 56.1 ¶ 3. He asserts that "this untimeliness caused [his] insulin level to become i[m]balanced," causing bouts of dizziness and pain throughout his "entire body." Am. Compl. ¶¶ 7–8. As a result of the foregoing, Carter

---

[1] The following facts are drawn from Defendant's Rule 56.1 Statement of Undisputed Material Facts. *See* Defs.' 56.1, Doc. 34, and the parties' supporting submissions. Plaintiff has not filed a response to Defendants' 56.1 statement and those facts are deemed admitted. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *Baldwin v. Goddard Riverside Cmty. Ctr.*, 53 F. Supp. 3d 655, 657 (S.D.N.Y. 2014), *aff'd*, 615 F. App'x 704 (2d Cir. 2015) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (quoting *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). In view of Plaintiff's *pro se* status, the Court also draws on facts alleged in Plaintiff's Amended Complaint.

asserts that he has been subjected to extreme physical and mental pain and suffering and seeks damages in the amount of $5 million. *Id.* at 11.

## II. PROCEDURAL BACKGROUND

Carter filed the instant action ("*Carter I*") on October 3, 2016. Doc. 2. On December 1, 2016, Chief Judge Colleen McMahon granted Carter leave to proceed *in forma pauperis*. Doc. 5. On December 9, 2016, identifying numerous deficiencies in Plaintiff's pleading, Judge McMahon granted Carter 60 days to file an amended complaint. Doc. 6. Because Carter did not amend his complaint within the period provided, on March 1, 2017, Judge McMahon dismissed the complaint. Doc. 7. Shortly thereafter, on March 21, 2017, however, Carter submitted a letter informing the Court that its prior order was sent to an incorrect address. Doc. 9. Accordingly, on April 5, 2017, the Court granted Carter a 60-day extension to file an amended complaint. Doc. 10. On April 7, 2017, Carter filed his Amended Complaint. Doc. 11.

While *Carter I* was pending, however, on December 7, 2016, Carter initiated a second action, *Vingal Carter v. Mingo*, 16 Civ. 9466 (VEC) (RLE) ("*Carter II*"), against the same named Defendants. In that action, Carter alleged that on February 19, 2015 he was "jumped" by several inmates at AMKC, and that the correction officer who was scheduled to work that shift was not manning his post and therefore could not intervene to stop the attack. Defs.' 56.1 ¶ 5; Declaration of Joshua C. Wertheimer ("Wertheimer Declaration"), Ex. A at 4. As a result of the attack, Carter's jaw was broken and he underwent surgery to repair it. Wertheimer Declaration, Ex. A at 5.

On December 29, 2016, Carter amended his complaint in the *Carter II* action, alleging claims virtually identical to those brought in *Carter I*, namely, that he was "denied visits . . . phone[,] shower, . . . recreation[,] . . . commissary," and was "forced to sleep on a mattress that"

3

did not fit his or his bed's frame.  Defs.' 56.1 ¶ 6; Wertheimer Declaration, Ex. B at 4.  He further alleged that he was given his diabetes medication after his meals, which he claimed caused a false blood sugar reading and "place[d] [his] life in imminent danger."  *Id.*

On January 9, 2017, Carter filed a second amended complaint in *Carter II*, this time reasserting that he had been jumped and that the correction officer responsible for working that shift was not on duty and therefore could not intervene to stop the attack.  Defs.' 56.1 ¶ 7; Wertheimer Declaration, Ex. C at 4.

On March 10, 2017, Evan Jaffe, an Assistant Corporation Counsel for the City, sent Carter a letter informing him that his claims in *Carter II* had previously been settled in September 2015, prior to his even filing the *Carter II* complaint.  Doc. 38 at 4.[2]  The parties subsequently discussed the matter by phone, and Carter revealed that he had no knowledge of that settlement, did not sign the release (the "September 2015 Release") and never received the $7,500 payment in consideration of releasing his claims.  *Id.* at 5; Pl.'s Opp., Doc. 39, at 6.  (Carter asserts that, unbeknownst to him, on September 15, 2015, his then-counsel, Matthew B. Waller, entered into a settlement agreement with the City and executed the September 2015 Release.  *See* Doc. 38; Pl.'s Opp. at 6–9.)

According to Carter, Jaffe then extended the same settlement offer to him and informed him that it would be "best" if he took the settlement, given the time and risk involved if Carter chose to prosecute his case in court.  Doc. 38 at 5.  In response, Carter asked Jaffe whether, if he, Carter, accepted the settlement he could bring claims against his prior attorney for forging his signature on the September 2015 Release.  Jaffe allegedly told him that he could, and Carter

---

[2] The Court notes that on March 10, 2017, Gary Moy, Senior Counsel for the City, filed a letter in *Carter II* informing Judge Caproni of the September 2015 settlement and seeking dismissal of the action.  *See Carter II*, 16 Civ. 9466 (VEC) (RLE), Doc. 16.  It is, however, immaterial to the Court's analysis whether it was Jaffe or Moy who contacted Carter by letter on March 10.

4

decided to take some time to think the settlement over. *Id.* Carter called Jaffe back the following week and allegedly informed him that that he "ha[d] a change in plans" and would "not tak[e] the settlement." *Id.* Carter alleges that Jaffe then "co[erced] and convinced [him] to sign the document." *Id.* Carter goes on to explain that he asked Jaffe whether he could "guarantee" that Carter would receive the settlement funds allegedly "stolen by [his] lawyer" if he agreed to sign the settlement. *Id.* Jaffe replied that he could not guarantee that Carter would receive the settlement funds, but that he "should" receive the funds. *Id.* After hearing that, "[Carter] said o.k."; Jaffe sent Carter the settlement, and Carter signed it, had it notarized, and sent it back. *Id.*

Thus, on April 19, 2017, twelve days after filing the Amended Complaint in *Carter I*, Carter entered into a settlement, agreeing to release claims asserted in *Carter II*. April 2017 Release at 2.[3] As a condition of the settlement and in consideration of a payment of $7,500, Carter executed a general release whereby he agreed to "release[] and forever discharge[] the City of New York, and all past and present officials, officers, directors, managers, administrators, employees, agents, assignees, lessees, and representatives of the City of New York, and all other individually named defendants and/or entities represented and/or indemnified by the City of New York . . . from any and all liability, claims, or rights of action alleging a violation of civil rights . . . and any and all claims, causes of action, suits . . . known or unknown . . . against the RELEASEES for, upon or by reason of any matter, cause or thing whatsoever that occurred through the date of this RELEASE." *Id.* at 1. That same day, Carter signed a

---

[3] Although the City asserts in its 56.1 statement that the April 2017 Release was signed on April 17, 56.1 ¶ 8, the Release itself is clearly dated April 19, 2017. April 2017 Release at 2.

stipulation and order of dismissal of the *Carter II* action, which was so ordered by the Court and entered on the docket on May 1, 2017. *Carter II*, 16 Civ. 9466 (VEC) (RLE), Doc. 21.

On October 23, 2017, the City informed this Court that it had recently learned of Carter's April 2017 settlement in *Carter II*. Doc. 27. The City therefore requested a stay of all deadlines and permission to make a limited motion for summary judgment on the basis that, by signing the April 2017 Release, Carter had released the City from the claims asserted in this action. *Id.* Although the Court denied the City's request to stay all deadlines in the case, it granted the City's request for a limited motion for summary judgment. Doc. 28. On November 9, 2017, the City filed its motion for summary judgment, Doc. 31, and, between November 2017 and January 2018, Plaintiff responded with four letters in opposition. *See* Docs. 37 – 40. The Court now rules on that motion.

### III. LEGAL STANDARD

#### A. Rule 56 Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### B. *Pro Se* Plaintiff

The Court holds submissions by pro se litigants to "less stringent standards than formal pleadings drafted by lawyers," *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (quoting *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)), and is obligated to liberally construe their pleadings "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (citations omitted). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). Nor does Rule 56 "'impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute,'" even where the non-moving party is *pro se*. *Charles v. City of New York*, No. 07 CIV. 2782 (RJS) (GWG), 2011

WL 2936428, at *5 (S.D.N.Y. July 22, 2011) (quoting *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002)).

## IV. DISCUSSION

The sole question before the Court is whether the April 2017 Release bars Carter's claims against Defendants in the instant suit. The City contends that it does because the Release's language is broad and unambiguous. Pursuant to its terms, Carter

> "release[d] and forever discharge[d] the City of New York, and all past and present officials, officers, directors, managers, administrators, employees, agents, assignees, lessees, and representatives of the City of New York, and all other individually named defendants and/or entities represented and/or indemnified by the City of New York . . . *from any and all liability, claims, or rights of action alleging a violation of civil rights . . . and any and all claims, causes of action, suits . . . known or unknown* . . . against the RELEASEES for, upon or by reason of any matter, cause or thing whatsoever *that occurred through the date of this RELEASE.*"

April 2017 Release at 1 (emphasis added). There is no dispute that the Release encompasses the Defendants and type of claim at issue here. The Defendants here easily qualify as "officials," "agents" or "employees" of the City, or individual defendants or entities "represented and/or indemnified by the City," and the claims advanced here allege a "violation of civil rights," in addition to falling under the more sweeping release of "any and all claims." *Id.*

Rather, Carter advances three arguments, none of which are based on the text of the Release. First, Carter argues that the Court should not read the April 2017 Release to cover claims brought after September 15, 2015, the date on which the September 2015 Release was purportedly fraudulently executed by his prior counsel. Doc. 38 at 4; Pl.'s Opp. at 6–9. In essence, Carter reasons that because he only signed the April 2017 Release to perfect the September 2015 Release and obtain the settlement proceeds that he had not received, the April 2017 Release should bar only claims that accrued at the time the September 2015 Release was

executed. Doc. 38 at 4; Pl.'s Opp. at 7–9. This argument fails for several reasons. As an initial matter, and as Defendants correctly note, Defs.' Reply at 5, "[u]nder New York law, a release that is clear and unambiguous on its face . . . will be enforced." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, 681 F. App'x 64, 66 (2d Cir. 2017) (quoting *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998)). Here, the April 2017 Release is unambiguous that it releases all claims "that occurred through the date of *this* RELEASE." April 2017 Release at 1 (emphasis added). Carter signed, dated, and notarized the Release on April 19, 2017. *Id.* at 2. The April 2017 Release therefore bars all claims against the Defendants that accrued through April 19, 2017. This necessarily includes the claims at issue in the instant action, which are alleged to have accrued between April and October 2016. *See* Am. Compl., Doc. 11 ¶ 1 (asserting that he was held in custody at AMKC for 180 days beginning on April 17, 2016). What's more, Carter's claim that the September 2015 Release freezes the date on which the latter release applies is contradicted by his position that he never signed the September 2015 Release, was unaware of its existence, and never received any consideration to bind him to it. Pl.'s Opp. at 4 (asserting that the September 2015 Release was "signed fraudulently by my attorney . . . and notarized . . . without my consent"); Doc. 38 at 5. Thus, by Carter's own admission, the September 2015 Release was not an enforceable contract and he cannot invoke its terms. *See Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 31 (2d Cir. 2018) ("To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound . . . . That meeting of the minds must include agreement on all essential terms . . . ." (quoting *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009)).

Second, construing Carter's papers liberally, as the Court must, Carter appears to assert

that the Release is void for duress. Specifically, in detailing the circumstances under which Carter signed the April 2017 Release, he asserts that after calling Assistant Corporation Counsel Jaffe on the phone and rejecting his offer of settlement that Jaffe then "co[erced] and convinced" him to sign the document. Doc. 38 at 5. "In order for a contract to be void for duress, one of three circumstances must be present: duress by physical compulsion, duress by threat or [duress] by undue influence." *Reid v. IBM Corp.*, No. 95 CIV. 1755 (MBM), 1997 WL 357969, at *6 (S.D.N.Y. June 26, 1997) (quoting *Evans v. Waldorf–Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y.1993), *aff'd*, 33 F.3d 49 (2d Cir. 1994)).

Here, Carter does not allege that there was any physical compulsion involved during his phone conversation with Jaffe. Nor does he allege that Jaffe threatened him in any way. Rather, at best, he claims that Jaffe used his influence in an undue manner. But even that claim is unavailing. Accepting Carter's allegations as true, Jaffe merely informed him that settling the case would save him the risks inherent in litigation, and that Carter would likely receive the $7,500 in settlement proceeds. With that assurance, Carter confirmed his intent to execute the settlement agreement and Jaffe sent it to him. Doc. 38 at 5. In return, Cater received the settlement proceeds due under the April 2017 Release. Defs.' 56.1 ¶ 8. Nothing alleged here provides any indication that Jaffe used undue influence to overbear Carter's free will. *See Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 403 (S.D.N.Y. 2017) ("[A] plaintiff must show that he was compelled to agree to its terms by way of wrongful and oppressive conduct that precluded the plaintiff from the exercise of his own free will.") (quoting *McIntosh v. Consolidated Edison Co.*, 1999 WL 151102 at *2 (S.D.N.Y. Mar. 16, 1999)); *see also Silverberg v. SML Acquisition LLC*, No. 15-CV-7129 (CS), 2017 WL 758520, at *8 (S.D.N.Y. Feb. 27, 2017) (noting that the "plaintiff must show that the defendant's actions 'deprived [him] of [his]

free will') (quoting *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993)).

Setting aside those innocuous statements, Carter does not allege that anyone actually coerced him to sign the documents *at the time that he signed them*. *See* Doc. 38 at 5. Instead, there is every indication that Carter had the time and independence to contemplate his decision. Carter concedes that he reviewed, signed, and had the settlement notarized on his own, *id.*, and he does not contend that Jaffe or anyone from the City exercised any "wrongful or oppressive conduct" or language at the time that he signed the April 2017 Release, *Gaughan*, 261 F. Supp. 3d at 403. Accordingly, the Court concludes that the April 2017 Release is not void for duress.

Finally, in a last-ditch effort, Carter asserts that he "had no knowledge [of] what [he] was signing" and therefore did not understand the consequence of signing the April 2017 Release. Pl.'s Opp., at 11, ¶ 9. He contends that this is because he "can't see in [his] left eye or read fine print in [his] right eye." *Id.* In view of Carter's multiple litigations in federal court, and his numerous complaints, briefs, and letters to the Court responding in detail to Defendants' arguments, the Court finds it incredible that Plaintiff could not read the two-page, standard-sized-font release that he signed. But the Court need not make a credibility determination at this juncture. It is sufficient for the Court's purposes here that Carter signed the September 2017 Release, received $7,500 as consideration, and that the Release was not procured by duress. If Carter "wishes to challenge the validity of the settlement agreement," the appropriate place to raise his challenge is in the case in which the settlement agreement was entered—*i.e.*, in *Carter II* before Judge Caproni. *Loccenitt v. Pantea*, No. 12 CIV. 1356 AT, 2014 WL 7474232, at *3 (S.D.N.Y. Dec. 29, 2014); *Smith v. City of New York,* No. 12 Civ. 3303 (CM), 2013 WL 5434144, at *6 (S.D.N.Y. Sept. 26, 2013) ("Only if the Release were set aside in the [original] lawsuit could [plaintiff] bring his claims in this action."). Carter should bear in mind that,

having accepted the benefit of the bargain, even if he could prove that his alleged inability to read the Release were a basis for challenging its validity, he would still need to repay the City the settlement proceeds to unwind the agreement.

Accordingly, the Court concludes that, accepting Carter's allegations as plead, there is no genuine dispute that the April 2017 Release is enforceable against Carter and precludes his claims in the instant action.

## V. CONCLUSION

For the reasons set forth above, the City's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 31, mail a copy of this Opinion and Order to Plaintiff, and close the case.

SO ORDERED.

Dated: July 6, 2018
      New York, New York

                                                          Edgardo Ramos, U.S.D.J.